No. 31,894

THE STATE OF KANSAS, ex rel. ROY J. McMULLEN, County Attorney of Barton County, *Plaintiff*, v. THE STATE HIGHWAY COMMISSION, *Defendant*.

(33 P. 2d 324.)

Opinion filed June 9, 1934.

*Roy J. McMullen,* county attorney, and *Thomas Amory Lee,* of Topeka, for the plaintiff.

*Wint Smith,* attorney for state highway commission, *Arthur J. Mellott,* of Kansas City, *James E. Smith* and *Clayton M. Davis,* both of Topeka, for the defendant.

*A. C. Malloy, R. C. Davis, Warren H. White,* all of Hutchinson, and the following county attorneys: *Roscoe King,* Marion county, *Alex A. Hotchkiss,* Osage county, *E. S. Crawford,* Dickinson county, *D. C. Hill,* Pottawatomie county, *J. F. Tillman,* Osborne county, and *A. B. Ross,* Chautauqua county, as *amici curiœ.*

The opinion of the court was delivered by

SMITH, J.: This is an original proceeding in mandamus. Defendant filed a motion to quash the alternative writ.

The alternative writ sets out certain transactions of the board of county commissioners of Barton county and the state highway commission. These transactions arose out of the operations of the county and the commission in building roads in Barton county during the operative period of chapter 214 of the Laws of 1925, and chapter 255 of the Laws of 1927.

These two chapters provided that the state highway system should be constructed, reconstructed, improved and maintained by the boards of county commissioners of the various counties subject to the supervision of the state highway commission; and also that all contracts should be let by the county commissioners and approved by the state highway commission; also that the construction and maintenance should be subject to the approval of the commission and under the direction of the county commission. This plan was adopted by the legislature to meet the requirements of the federal authorities that they would deal only with states in furnishing funds to aid in the construction of roads. Under the constitution at the time in question the state could only aid the counties in the building of roads, but could not engage in the construction of them itself. (See sec. 8, art. 11 of the constitution of Kansas, known as the amendment of 1920.) Since this amendment is of interest to us in the consideration of this case it will be set out here. It is as follows:

"The state shall never be a party in carrying on any works of internal improvement except to aid in the construction of roads and highways and the reimbursement for the cost of permanent improvements of roads and highways, constructed after March 1, 1919; but such aid and reimbursement shall not be granted in any county for more than 25 per cent of the cost of such road or highway, nor for more than ten thousand dollars per mile, nor for more than one hundred miles in any one county."

This amendment was superseded by the adoption, in 1928, of two amendments. They are sections 9 and 10 of article 11 and read as follows:

"The state shall never be a party in carrying on any work of internal improvement except that it may adopt, construct, reconstruct and maintain a state system of highways, but no general property tax shall ever be laid nor bonds issued by the state for such highways."

"The state shall have power to levy special taxes, for road and highway purposes, on motor vehicles and on motor fuels."

It will be noted that these two amendments for the first time conferred on the state the power to adopt and build a system of highways from taxes raised on motor vehicles and motor fuels. Under the last two named amendments chapter 225 of Laws of 1929 was enacted. This act took effect April 1, 1929. Under its provisions the state itself, acting through the highway commission, assumed the duty of constructing, reconstructing, improving and maintaining that portion of the highways of the state in each county designated as a part of the state highway system. Since the county commissioners had been doing the work under the supervision of the highway commission, when the state itself took over the work it became necessary that there be an adjustment of accounts between the several counties and the commission. The act of 1929 contained the following provision with reference to this:

"That on April 1, 1929, the boards of county commissioners of the various counties shall transfer to the state highway commission and deliver to its authorized representatives all machinery, equipment and road materials which said counties have heretofore purchased from the county and the state road fund of such counties for use on state highways. That on April 1, 1929, the highway commission shall assume the rights and, liabilities of the various counties on all existing contracts for the construction, improvement, reconstruction, or maintenance of state highways and bridges and for the purchase of machinery, equipment or material for use on state highways." (Laws 1929, ch. 225, § 19.)

The statute also provided that there should be delivered over to the state treasurer and credited to the state highway fund all unexpended balances of certain funds in the several county treasuries, and that outstanding warrants issued by any county for the construction of roads included in the state highway system, and certain benefit-district costs, should be paid by the state highway commission. Under that section it became the duty of the board of county commissioners and the highway commission to adjust their respective rights and liabilities in reference to the county and state road fund as of April 1, 1929.

In the case of Barton county there was an attempt to do this. On November 9, 1929, a tentative settlement was made and the state

commission paid Barton county $31,498.17. The settlement, by its terms, was final unless later corrections were found necessary to comply with the laws of the state. The county claims now that a correction is necessary and that Barton county is entitled to the additional sum of $34,747.98. That sum is the money that Barton county expended in 1925 and 1927 in the construction and reconstruction of roads within the county that were part of the state system of highways from taxes raised under the provisions of R. S. 68-519 and R. S. 68-1102, these being the sections providing for the levy of a general property tax upon the property located in the county for the purpose of constructing and maintaining the roads of the county.

In brief, the claim of the county is that the part of the state highway system located in Barton county was separate and distinct from the other roads in the county as far as taxation is concerned; that the county commissioners had no authority to expend tax money raised by R. S. 68-519 and R. S. 68-1102 upon these roads; that such expenditure was an unconstitutional diversion of funds; and that since such expenditure was unconstitutional the highway commission should be compelled to pay the money expended back to the county. The constitutional provision upon which this argument depends is section 4 of article 11 of the constitution of Kansas. It is as follows:

"No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same; to which object only such tax shall be applied."

The argument of plaintiff is that R. S. 68-519 and R. S. 68-1102 provide for levying a tax for the construction of county roads and bridges; that the roads and bridges that constitute a part of the state highway system in the county are not county roads and bridges, but state roads and bridges, hence the purposes expressed in R. S. 68-519 and R. S. 68-1102 were not complied with when the money raised pursuant to them was used on part of the state highway system. The argument depends for its soundness upon a holding that the statutes providing for the establishment of a state highway system provided that the highways that had been selected as a part of the state highway system ceased to be roads of the county as much as though they were actually located beyond the borders of the county when they were designated as part of the state system. Unless this is the conclusion reached the argument of plaintiff falls. It is not a case where money raised to build a courthouse is being

used to pay officers, or money raised in a county is being used outside the county. No amount of legislation could make such a use of tax money constitutional. It is conceded by all parties that should R. S. 68-519 and 68-1102 be construed as providing for such expenditure it would be valid. The decision of this point will be the first consideration in this opinion.

From the time when the federal policy of furnishing funds to the states with which to construct highways was first put into effect, every legislature that met has enacted a comprehensive chapter to deal with this important question. A decision of the question before us will necessitate an examination of the various acts in sequence, together with opinions of this court construing them and the methods of carrying on the work between the state, the counties and the federal government.

Plaintiff relies on the decision of this court in *State, ex rel., v. Saline County Comm'rs,* 128 Kan. 437, 278 Pac. 554. In that case the court passed on the following act, being chapter 229 of the Laws of 1929:

"SECTION 1. That if any county or other political subdivision of this state desires to immediately improve any section of the state highway system within any county, which has been designated as a part of the state highway system, the state highway commission may enter into an agreement with such county or other political subdivision to finance the construction or reconstruction of said highways or section thereof. No county shall be allowed to issue bonds or borrow money to carry out any provision of this act: *Provided, however,* That the funds so advanced shall be without interest: *Provided further,* That the commission shall make repayment to said county or other political subdivision annually as the funds are available, and to apportion for such construction or reconstruction until the amount so advanced has been repaid. The total amount of agreements to be redeemed in any one year shall not exceed one million dollars."

The county commissioners of Saline county, acting under that statute, were about to enter into a contract with the state highway commission by which the county was to advance to the commission funds with which to build two highways in the county, and whereby the commissioners bound the county to use the county road fund, the county bridge fund, the county general fund, the county sinking fund, the bond fund, and the twenty per cent fund for the purpose of obtaining this money and to issue deficiency warrants against the above funds when deemed expedient. The funds so advanced to the commission were to be expended by the commission upon the

construction of the highways at least to an amount equal to that furnished by the county. Suit was instituted to secure a determination of whether the contemplated action was valid. It was attacked by the state on the theory that to make such a use of the funds in question would be to use money raised by taxation for a purpose other than that for which the tax was levied. The court pointed out the uses for which the county general fund, the bond and sinking fund are raised and that the use of these funds for any other than the specific one for which the tax was levied is a misdemeanor. It was also pointed out that the proposed issuance of deficiency warrants against the funds in question was without authority in law. The language of the opinion which plaintiff argues is controlling on the question here is the following:

"Each of the funds is distinct from the others and it is beyond the power of the commissioners or others to divert funds raised by taxation for one purpose and apply them to another. It would be a violation of the constitution to apply the bond fund to the building of county roads or to apply the sinking fund to the building of county bridges. No more can the funds raised for each of the specific purposes mentioned be loaned to the state highway commission or applied to the building of state highways. State highways and county and township highways are not in the same class, nor are they under the same control. In the classification made by the legislature, highways are specifically placed in groups, one of state highways, and all the others into county and township roads (Laws 1929, ch. 224, sec. 1), and state highways cannot be regarded as county roads." (p. 440.)

It is doubtful if the decision is entitled to the weight claimed for it by plaintiff in our present controversy. It is not plain that the case would have been decided as it was if the road and bridge funds alone had been involved. Furthermore, the decision was written after the adoption of the amendment of 1928 and the enactment of chapter 224 of the Laws of 1929. This chapter was cited by the court as the authority for holding that there was a distinction between the roads in the county that had been designated as a part of the state highway system and county and township roads. This was after the state had embarked on the business of building roads on its own account. Furthermore, the funds we are concerned with were raised from taxes levied for the purpose of building roads within the county and were used for that purpose, the only distinction being that these funds were used to construct roads that had been designated by the county commissioners as part of a state system of highways.

The situation we are considering arises under the acts of 1925 and 1927 when all the state was authorized to do was to aid counties in road building. All of the statutes that have any bearing on the question must be considered together. First, we must consider the manner in which the money to construct state highways was obtained in 1925. Up until the passage of the highway act of that year all roads and bridges in the state had been built entirely from funds raised within the counties, except for federal aid. The legislature of 1917 created the first highway commission by chapter 264 of the Laws of 1917. At that time the state could not even aid in the construction of highways. The act of 1917 contained two provisions, as follows:

"SECTION 1. That the assent of the legislature is hereby given to the provisions and requirements of the act of congress approved by the president, July 11, 1916, entitled 'An act to provide that the United States shall aid the states in the construction of rural post roads, and for other purposes.'

"SEC. 2. That the state highway commission as created by section 4 of this act is deemed and declared to be the state highway department of Kansas and is authorized and empowered to enter into all contracts and agreements necessary to coöperate with the secretary of agriculture and to do and perform all other acts required of state highway departments in accordance with the terms and conditions as expressed in section 6 of the above-named act of congress, and the county treasurer of any county in the state is hereby authorized and empowered to receive all grants of money apportioned to any such county under the aforesaid act of congress and to pay out the same on vouchers in the form provided by the secretary of agriculture and the state highway commission."

Attention is called to the fact that provisions in substantially the same language have been carried into subsequent enactments each time the highway statute has been reënacted. At the present time they are R. S. 1933 Supp. 68-401 and 68-402. These sections were enacted as a part of the Laws of 1917 to permit the state to take advantage of the provisions of the federal statutes appropriating money for the construction of highways. Section 3 of the act of July 11, 1916, provided that in states where the constitution prohibited the state from engaging in internal improvements the amount to be appropriated—

"Shall be turned over to the highway department of the state or to the governor of said state to be expended under the provisions of this act and under the rules and regulations of the department of agriculture, when any number of counties in any such state shall appropriate or provide the proportion or share needed to be raised in order to entitle such state to its part of the appropriation apportioned under this act." (39 U. S. Stat., ch. 241, § 3, p. 356.)

In 1925 and 1927 Kansas was one of the states whose constitution forbade it being a party to internal improvements except in the limited way we have seen was provided by the amendment of 1920. The situation was about as we have detailed it here when the highway act of 1925 was enacted.

The enactment of chapter 214 of the Laws of 1925 was the first action of the state to take advantage of the good-roads amendment of 1920. At the same session chapter 274 was enacted. This statute imposed a tax on the sale and use of motor-vehicle fuel, and provided that the money raised thereby should be used to create a fund for the construction and maintenance of roads, and that the portion of the revenue arising from the tax collected from each county should, by the state treasurer, be returned and paid over to such counties. That act took effect March 5, 1925. Chapter 214 of the Laws of 1925 was passed and took effect March 17, 1925. Section 4 of that act provided for a different distribution of the money raised by the gasoline tax and the motor-vehicle-license fees than had been up to that time provided for. The money was divided on the basis of 40 per cent equally amongst the 105 counties and 60 per cent on the basis of the assessed valuation. This was to be used to create a county and state road fund to be used to construct state roads in the counties. There was created, however, a fund of $300,000 a quarter that was to be expended in the various counties under the direction of the state highway commission acting in conjunction with the boards of county commissioners of the counties. The statute provided, however, in conformity with the constitutional provision, that not more than 25 per cent of the total cost of any particular project should be paid from that fund and not more than $10,000 a mile.

With all these statutes in force the board of county commissioners undertook to construct a road in 1925 as a part of the state highway system in Barton county. The first step was to make arrangements to obtain the federal money. To do this certain requirements must be met. In addition to the authority conferred on the state highway commission by sections 1 and 2 of chapter 264 of the Laws of 1917, section 7 provided, among other things, as follows:

"And boards of county commissioners are hereby authorized to enter into all contracts and agreements with the state highway commission as required by the federal-aid act."

That section is still in force as R. S. 68-405. Proceeding under this statute the board of county commissioners took the formal action necessary. In the preliminary resolution the road was referred to as a part of the "present county road system"; the resolution stated that $15,000 would be available from the general road fund and $15,000 from the bridge fund; the resolution was adopted for the purpose of constructing a road in Barton county. The county commissioners then adopted a "final resolution that the section of county road, etc.," be improved as a federal-aid road, the construction and maintenance to be carried out under the direct supervision of the state highway commission "acting as agent for said county" as required in the federal-aid road act and as authorized in chapter 264 of the Laws of 1917 and amendments thereto. (The federal-aid statutes are shown in the 1923 revision as sections 68-401 to 68-405, both inclusive, being sections 1, 2, 3, 6 and 7 of chapter 264 of the Laws of 1917.) The resolution further stated that the action of the board of county commissioners was in accordance with the decision of the state highway commission to recommend federal aid, and contained a further proviso to the effect "that this board pledges the good faith of said Barton county, Kansas, to construct this improvement and maintain said road as required in the federal-aid road act and the laws of Kansas."

Following the adoption of these resolutions, they, together with other documents, were forwarded to the state highway commission, and shortly thereafter the state highway commission, as then created, adopted a final resolution determining to make the improvement as a federal-aid road in accordance with the plans, specifications and estimates approved by the state highway engineer and the secretary of agriculture and in accordance with the provisions of chapter 264 of the Laws of 1917 and the amendments thereto; also in accordance with the federal-aid road act, the rules and regulations adopted by the secretary of agriculture and the county board's final resolution.

All of the above-mentioned documents were forwarded to the secretary of agriculture, together with a project statement, as required by the federal-aid road act and by chapter 264 of the Laws of 1917. While all of these documents were executed prior to the effective date of chapter 214 of the Laws of 1925, no construction was started until after that act took effect on July 1, 1925.

The board of county commissioners of Barton county, in con-

formity with the foregoing resolutions, caused plans for the construction of the particular section of road to be prepared, which were submitted to the state highway commission for approval, and approved. They were then approved by the United States district engineer and later by the secretary of agriculture, and it was agreed that the sum of $20,000 should be allocated to the project as federal aid, said sum not exceeding 50 per cent of the total estimated cost thereof.

A project agreement was then adopted. This federal-aid agreement or project agreement required the guarantee, by the state highway commission, of the balance of the estimated cost of the project after the application of federal aid. It stated specifically that the funds for the construction of the project had been made available "by the county of Barton, $39,370.44, August 17, 1926 (R. S. 1923, ch. 68; Laws 1925, ch. 214). Funds derived by tax levy."

This resolution appropriated from the county and state road fund, as raised by chapter 214 of the Laws of 1925, the sum of $15,000, provided for the application of state-aid fund amounting to $14,-127.17, which is equivalent to 25 per cent of the total estimated cost of the project, and appropriated from the general road and bridge fund of the county the sum of $10,198.27. The writ shows that while the estimated cost of the project was $59,370.44, the total cost of the project amounted to only $44,969.77. Federal aid in the amount of $20,000 was applied, leaving to be funded after its application the sum of $24,969.77.

Under this resolution the sum of $13,727.33, which had been raised by general-property tax in the county, was expended to construct this road. This is one of the items which occasioned the institution of this action.

Plaintiff places great stress upon the fact that R. S. 68-608 was repealed by chapter 214 of the Laws of 1925. That was section 8 of chapter 175 of the Laws of 1923. It is as follows:

"That section 9, chapter 217, Laws of 1921, be amended to read as follows: Sec. 9. In counties desiring to use the state-aid road fund to meet federal aid, and such desire is manifested by resolution duly passed by the board of county commissioners of any county, so stating, any such county shall under the direction of the state highway commission use such portion of the state-aid road fund described in section 1 of this act, that is necessary to meet any federal-aid project; not to exceed 25 per cent of the cost, or a maximum of ten thousand ($10,000) dollars per mile, *the remainder of the cost of the improvement may be paid from the road or bridge funds of the county, not*

*otherwise appropriated,* or may be financed by a benefit-district petition. When the work is performed by the county's forces the payment for the same shall be based on the actual cost of the work including a reasonable allowance for rental or depreciation on equipment, but in no event to exceed the engineer's estimated cost of the work or the lowest responsible bid received when said bid is below the engineer's estimate."

The provision of the above statute, the repeal of which plaintiff argues is conclusive in this case, is in italics.

Plaintiff argues that since this section gave the county commissioners authority to pay for part of the cost of improving or construction of a road that was included in the state system in the county from the road and bridge funds of the county, the repeal of the section constituted a legislative fiat that the road and bridge funds, raised by a general-property tax, could no longer be used for that purpose. The entire section dealt with the manner in which a county should proceed to take advantage of a fund called "the state-aid road fund." This was a fund raised from the sale of automobile licenses and distributed to the counties. It must not be confused with the state-aid road fund provided for in chapter 214 of the Laws of 1925. It provided a comprehensive plan for the use of whatever state-aid funds or money raised by benefit districts there were available at that time for the construction of state roads. When the gasoline-tax act was enacted in 1925, and the highway commission act of 1925 was passed a few days later, a far more elaborate scheme for the use of the funds raised by gasoline taxes and automobile licenses was found necessary, so, as we have seen, section 4 was written into chapter 214. Since the plan provided for in section 8 of chapter 175 of the Laws of 1923 was obsolete, on account of the fund to which it referred being superseded, the section was repealed. We have seen that the statutes giving county commissioners the right to bind the county to an agreement with the highway commission and the federal authorities were retained and reënacted. This indicated an intention on the part of the legislature to provide that the county commissioners could raise a part of the money to carry out the provisions of these contracts. The only way in which county commissioners could raise money was by a property tax. In considering this question we must remember that the roads constructed were located wholly in Barton county, and, even though they were a part of what had been designated as the state highway system, still the people of the county had more of an interest in them and received more benefit from them than those people who lived outside

the county. It is worth while noting that when a road became a part of the state highway system the state then became responsible for its maintenance. This has the result of making more money available from the county levy for the construction and maintenance of the county roads. It cannot be said, therefore, that the money expended on the state roads was not of special benefit to the taxpayers of that county.

In reaching this conclusion we are aided by some decisions of this court. The question was considered in the case of *State, ex rel., v. Comm'rs of Shawnee Co.*, 28 Kan. 431. In that case the state, by an act of the legislature, had directed the county commissioners of Shawnee county to construct a road in that county. The county commissioners questioned the constitutionality of the act. This court said:

"The laying out and keeping in order of highways is one of the ordinary duties of counties and cities. . . . It is true, it is called a state road, but there is no intrinsic difference between a state road, a county road and a township road—nothing which makes one more than the other of value to the public." (p. 433.)

Again this court said:

"We know of no reason why the legislature might not pass an act declaring all highways state roads, and place the management and control of them in commissioners appointed directly by the state and yet, if such an act were passed, the special value and benefit of each road to the community in which it is located would be unchanged." (p. 434.)

Not until the enactment of chapter 225 of the Laws of 1929 did we have in this state a system of state highways separate and distinct from township and county roads in the respective counties. This conclusion must of necessity follow a consideration of the provisions of the constitution which have been set out heretofore in this opinion. Up to that time highways that were commonly regarded as part of the state system of highways were designated in the first instance by the county commissioners and were constructed by the county commissioners. With the enactment of the gasoline-tax act of 1925 a great deal more money than had ever before been available for the construction of highways was placed within the reach of county commissioners. The state was moving rapidly toward the position in which it was placed by the constitutional amendment of 1928. It was not yet there, however. During the operative period of the acts of 1925 and 1927 the state could only supervise work the counties had initiated and could only oversee the

carrying out of contracts made by the county commissioners. The state commission assumed the important place it held in the road-building scheme of the state more on account of the federal stat-.utes, to which reference has been made, than by virtue of enactments of the state legislature.

We have concluded, therefore, that during the operative period of chapter 214 of the Laws of 1925 and chapter 255 of the Laws of 1927 there was no such setting aside of any roads in the state as to constitute them a part of a state system of highways as distinguished from the other roads in the county so as to make the expenditure of money raised under the provisions of R. S. 68-519 and 68-1102 upon their construction an unconstitutional diversion of funds. While the figures and calculations used in this opinion have dealt with the expenditure of money on one project only, what has been said applies with equal force to all projects pleaded in the alternative writ.

It follows that the writ will be denied. It is so ordered.